IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

Certified Copy

C.D. HAYES, INC., :

Plaintiff, : No. 01-376-C

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - - x

Wednesday, April 4, 2007

Washington, D.C.

30(b)(6) deposition of C. DAVID HAYES, commencing at 10:23 a.m., held at the offices of the United States Department of Justice, 1100 L Street, N.W., Washington, D.C., before Keith Wilkerson, a notary public in and for the District of Columbia.

Q. And you said you worked with project managers. Who were the project managers for the contract at issue in this case?

**A. Bob Rooks was the first project manager.**

Q. And who followed Mr. Rooks?

**A. If my memory serves me correctly, it was then Doug Morris.**

Q. And did anyone follow Mr. Morris?

**A. No, sir. We were terminated when Mr. Morris left.**

Q. During what period of time was Mr. Rooks the project manager?

**A. I'm pretty sure it was late '99.**

Q. And at that point Mr. Morris took over being project manager?

**A. The best I can recall.**

Q. What were the responsibilities of the project manager in connection with the construction contract?

**A. The project managers had the on site -- we had to put on an on site project manager because of the intensity of the government's management on**

**the project, and the on site project manager handled the submittal process, worked with the pay apps, getting them submitted, and handling the changes that arrived on the project, coordinating with the AAFES personnel facilities people.**

Q. Was the project manager the highest ranking employee of C.D. Hayes on site at the project?

**A. Yes.**

Q. You mentioned submittals, that the project manager was involved in submittals. What were submittals?

**A. That's for materials and material incorporated into the project. They have to be submitted to the architect and the government for approval. Things are built into the project.**

Q. And did those submittals have to occur and be approved before you could go forward with the construction?

**A. Yes.**

Q. You mentioned pay apps. Is that pay applications?

**paid for that we were directed to do by Jim Bailey.**
Q. So is this your request for a change order in connection with RFP number 113? I'm looking at the paragraph in the middle saying Reason for Change.
**A. Right.**
Q. And who would have made this request for a change order?
**A. This particular one was made by John Drake.**
Q. Is that Mr. Drake's signature in the middle of this page?
**A. I believe it to be.**
Q. And what is the date of this request for a change order?
**A. 4-21-2000.**
Q. And how much were you requesting in the way of a change in connection with RFP 113?
**A. $2,818.**
Q. Mr. Hayes, maybe you could help me a little bit. Explain to me how would go about requesting a change order if you believed you had

been ordered to do work beyond the scope of the contract?

**A. The way it should have been done is we should have been allowed to put in a request for a change in writing to the contracting officer according to the contract documents.**

Q. And is that what you were doing with the first two pages of Exhibit A to your claim letter?

**A. Yes.**

Q. So this was a request to the contracting officer for a change order in connection with RFP number 113?

**A. Correct.**

Q. Let's go on to the next -- is there another request for a change order attached to your September 29, 2000 letter?

**A. Yes, there is.**

Q. What is that request?

**A. There were some changes made to the shade cloth, which is a cover over the garden, you know, the landscaping area. The project specifications stated that the color was deep sea blue and the color**

was changed by the architect to a brown color that AAFES preferred, and they had denied it previously, so we were told not to submit it again, not to take it on up to Paul Kelleher, the architect. It was actually the architect's mistake, and he didn't want us to send it up on AAFES for a change order and they didn't want to pay for it, either.

Q. When you say it had been denied before, what do you mean that it had been denied before?

A. We had ordered the shade cloth according to the contract specifications, deep sea blue, had it on the job and was ready to install, and they were oh, no, no, no, we don't want that, we want brown. So we ordered brown at that suggestion and installed brown.

Q. We talked a little bit earlier about submittals. Would there have been a submittal on the shade cloth?

A. Yes, there was.

Q. And explain to me how that process would have worked with respect to the shade cloth.

A. Since we were using exactly the specified

products, and it was a Hendee or Hindee, I forget how to pronounce it, we got literature from them and submitted the literature to them. I think the shade cloth actually arrived at the site because it was a long lead item in the first phase of the project. We went ahead and released it and got exactly what was in the specifications, and when the paperwork came, we submitted the paperwork.

Q. When you say the paperwork --

A. Submittal data from Hendee.

Q. So let me see if I understand this correctly. You went to Hendee as somebody you could buy the shade cloth from and asked them for a price for the shade cloth?

A. That's correct.

Q. You got the information from Hendee, and then you submitted that to who?

A. The architect, KDD Architects.

Q. And then the architect would review what you submitted to them?

A. Yes.

Q. And they would sign off on it then?

**A. Yes.**

Q. And after they signed off on it you would go ahead and then purchase what they approved you to purchase?

**A. In most cases yes, that's what you do.**

Q. And is that the way the process is supposed to work?

**A. Yes.**

Q. Turning two pages forward there is what appears to me to be another request for change order; is that correct?

**A. Two pages forward or backward? Deeper into it?**

Q. Deeper into it, yes.

**A. Yes.**

Q. Could you explain what this request for a change order was?

**A. This was also in the -- this was additional footings that were required that were not shown on the drawings in the garden area which we had to put in, and Jim Bailey had denied them himself, and we found out it had never gone up to Paul**

BY MR. HARRINGTON:

Q. So this is a third request for change order that you attached to your September 29, 2000 claim letter?

**A. That's correct.**

Q. And what did this request for a change concern? I know you've been through that a little bit: You said that this was for concrete footings?

**A. Concrete footings that were not shown on the drawings that were required for the structural supports for the canopy framing.**

Q. Moving on to the next attachment to this letter, is this another request for a change order?

**A. It says request for information.**

Q. Is a request for information different than a request for a change order?

**A. Technically, yes.**

Q. What is the difference?

**A. A request for information is, to put it simply, we don't know what to do, tell us what to do. And of course a change order is saying this is a changed condition and we want direction and**

**clarification on it.**

Q. So a request for information might or might not concern a change?

**A. It's possible, yes.**

Q. Is this next page request for information number 133?

**A. Yes. On each of the drawings in the demolition pages they had notes about what work, what demolition work was to transpire on that particular set of drawings. On demo sheet D3 there was nothing stated to be removed on the floor or wall finishes in that main retail area.**

Q. What phase of the project did this request for information concern?

**A. I believe it was either late in five or early in six. I believe it was phase six, but I'm not sure.**

Q. And when did you make this request for information?

**A. The 31st of May.**

Q. Going on to the next page, is that another request for information?

A. Yes, it is.

Q. And this is request for information number 134?

A. That's correct.

Q. And when did you make this request for information?

A. May 31st.

Q. What did this request concern?

A. There was a request for clarification on some windows that were not shown to be removed under note 11 of the demolition plans, and it appeared to be a conflict, because on architectural drawing sheet 4 it shows that they were to be infilled with masonry.

Q. Do you know what phase of the project request for information number 134 concerned?

A. I believe it was phase six. It was either late in phase five or in phase six. I'm pretty sure it was phase six.

Q. You said you weren't sure about number 133 either. Do you believe that it was phase six?

A. I believe they were both phase six. It

**was right at the end of the project.**

Q. Do you know of any other request for change orders or requests for information or any other documents that were attached to your September 29, 2000 letter?

**A. Not that I recall.**

Q. Now, we were just talking about those requests for information. Could you explain to me how it was supposed to work for you to go from a request for information through the process and if there was a change the process to getting a contract amendment?

**A. The process changed somewhat during the course of the project.**

Q. And right now, Mr. Hayes, what I'm focusing on is how it was supposed to work under the terms of the contract. And I understand that you've said that there were some things that didn't go in accordance with the terms of the contract. First I want to figure out how it was supposed to go under the contract, and then we can turn to any variations from that.

**A. That's correct. There's two change orders included in this amendment.**

Q. And that would be change order number three and change order number four?

**A. Correct.**

Q. And so this is the sort of grouping that you were talking about.

**A. Correct.**

MR. HARRINGTON: Let's go ahead and go off the record.

(Recess.)

BY MR. HARRINGTON:

Q. Mr. Hayes, I was asking you some questions about Exhibit 6, which is your September 29, 2000 claim letter. Aside from the letter itself and the attachments that we've identified, was there any other information that was submitted to AAFES at this time?

**A. I think this is all that was submitted with this letter.**

Q. And so there were no other proposed change orders that you identified to AAFES as the

basis for or in connection with this particular claim?

A. I don't think so, no.

(Deposition Exhibit No. 7 was marked for identification.)

BY MR. HARRINGTON:

Q. Mr. Hayes, we've marked as Exhibit 7 a document titled Plaintiff's Response to Defendant's Second Set of Interrogatories. Could you look at about five pages in? There's a page entitled verification. Is that your signature on the verification page?

A. Yes.

Q. Have you looked at these interrogatory answers before today?

A. Yes.

Q. As you sit here today, do you believe these interrogatory answers are correct and accurate? I can put it a little differently as well. Are you aware of any changes that should be made to these interrogatories since your January 29, 2007 verification of the interrogatory answers?

**A. No. I don't think there's any changes that would need to be made to it.**

Q. So as of today at least you believe the answers given back in January remain accurate and correct?

**A. Yes, sir.**

Q. Let's turn to the answer to interrogatory number one. That interrogatory says:

For each change to the contract (whether actual or constructive) upon which plaintiff bases its claim for an equitable adjustment, describe in detail the change that was ordered by AAFES including, but not limited to, the contract specifications that were changed, the identity of the individual who ordered the change, the identity of the individual to whom the order was directed, and whether the change was an actual change or constructive change.

Now, in response to this interrogatory you identify a number of bases for your request for an equitable adjustment; correct?

**A. Yes, sir.**

interrogatory answer?

**A. Yes, that's correct.**

Q. Let's work through these one by one. The first change identified is $10,000 in additional office labor required to convert the SureTrak schedule originally submitted by C.D. Hayes to a less sophisticated software package.

Is that the first change that you identified?

**A. Yes.**

Q. When did the work converting to SureTrak begin?

**A. At the beginning of the project we were supposed to present a new project schedule which we as soon as the contract was awarded we began working on it. As a matter of fact, in the preconstruction conference I took them a rough draft of a SureTrak schedule just listing the six phases with no details, just to show them that I was going to use SureTrak at the preconstruction conference. Then we began working on it, and it took about a month to put the SureTrak project together in detail showing all the**

internal parts of each phase.

Q. Now, the work through SureTrak, SureTrak was the scheduling system that you were originally using?

A. Yes.

Q. And then it talks about converting to a different software package.

A. Correct.

Q. Was that second software package Microsoft Project?

A. Yes, it was.

Q. When did it is work converting from SureTrak to Microsoft Project begin?

A. I can't give you a specific date, but it was after we submitted the SureTrak to the government, and they didn't have SureTrak software themselves so that they could go in and play with the schedule and work with it themselves, so they twisted our arm to use Microsoft Project, which required us to redo everything in the Microsoft Project.

They furnished us a copy of Microsoft Project which, as we entered all of our data, we

**found out that the copy that they had furnished us had an error in it and it wasn't calculating correctly. They gave us software, but it was a copy of the original, it wasn't a licensed copy.**

Q. Do you know about when it was that you started doing the conversion from SureTrak to Microsoft Project?

**A. It was in the spring of, I think, '99 was the first -- it was right after we first started the project. We started in what, January '99? It would have been somewhere in the neighborhood of March-April.**

Q. Looking at Exhibit 2, it shows that the contract was signed by the contracting officer on December 3, 1997.

**A. Yes.**

Q. Was it a year and a half or over a year after the contract was signed?

**A. It must have been '98, then. It must have been '98. I got my years mixed up.**

Q. When did your work converting to Microsoft Project end?

the work?

**A. The field project manager, Bob Rooks, did most of the work.**

Q. Was there anybody besides Mr. Rooks who was doing this schedules work?

**A. There was a girl in the office that was familiar with Microsoft Project, and she made trips up to Fort Eustis and tried to help him get it to work.**

Q. Aside from Mr. Rooks and the girl that you mentioned whose name you don't recall, was there anyone else?

**A. The estimator worked with them some in explaining links and so on with SureTrak. His name was Mike Turbyfill.**

Q. And was he employed by your company?

**A. Yes.**

Q. Do you know how much -- do you have time records that show when this work was being completed?

**A. No.**

Q. Do you have time records that show how much time Mr. Rooks put into this?

**A. No official documents or separate time sheets. He was on salary, so he was working.**

Q. Would there be any records or notes or other documents that he retained or that you retained that would have indicated how much time he was spending on this?

**A. In the monthly project meetings there was a lot of discussion on the schedule and spending a lot of time on it as far as it didn't work. There was a lot of discussion in the meeting minutes.**

Q. Do you know if those minutes would indicate how much time Mr. Rooks had spent on it?

**A. Not specifically.**

Q. Do you know if there are any records that indicate how much time other employees, for instance the girl in your office or Mr. Turbyfill spent?

**A. No. They were all salaried employees.**

Q. And aside from being mentioned in the meeting minutes, do you know of any other documents that would provide any more information about how much time was spent?

**A. I don't know of any.**

Q. Do you, yourself, know as you sit here today how much time Mr. Rooks spent on this?

**A. Not exactly, no.**

Q. Do you know how much time Mr. Turbyfill spent on this?

**A. I would guess that Turbyfill may have spent 30-40 hours on it, on helping them with the conversion, the same thing with the girl in the office, but Rooks spent untold hours on it.**

Q. You don't know precisely how much any of these three individuals spent on this work?

**A. Not precisely, no.**

Q. Was a proposed change order concerning this work submitted to AAFES?

**A. When it was discussed we were told don't even go there by Mr. Jim Bailey.**

Q. So then you didn't submit a document like those attached to your September 29, 2000 claim letter with respect to the SureTrak conversion?

**A. That's correct. We did not.**

Q. Mr. Hayes, the next paragraph, paragraph two in answer number one of the interrogatories,

Q. What is the purpose of the letter that is marked as Exhibit 11?

**A. It has an amendment of the contract attached to it, number 37.**

Q. And what did this contract amendment concern?

**A. It added $4,649 to the contract.**

Q. Do you know if you signed this contract amendment?

**A. No, I don't recall.**

Q. Do you know if this contract amendment was signed by your surety after your participation in the contract was terminated for default?

**A. It could be, because they wouldn't let me receive any more money at the end. It might have been signed by them.**

Q. So if this contract amendment was executed by the surety after the termination for default the money would have been paid to the surety?

**A. I guess they would have taken it, yes.**

Q. Mr. Hayes, do you know when phase two of the project was completed?

**A. No, I don't. Either one of these two gentlemen may have a better handle on that since they were on the site.**

Q. Do you know what year it would have been done? Do you want even know what year it would have been done?

**A. I think it was done in late '98.**

Q. Do you know when phase one of the project was completed?

**A. I don't recall. It was in '98, but I don't know exactly when.**

**(Deposition Exhibit No. 12 was marked for identification.)**

**BY MR. HARRINGTON:**

Q. Marked as Exhibit 12 is a proposed change order relating to RFP 110. Do you recognize this document, Mr. Hayes?

**A. Yes.**

MR. YARBOROUGH: Excuse me just a second. I apologize for interrupting, but I want to be sure I'm looking -- the way we're doing this kind of gets me confused a little bit. It looks to me like he got

was a specified product with a specified color, deep sea blue. Jim Bailey was pushing us to get the shade cloth, we were in phase one of the project, and we were trying to get submittal data from Hendee, which is the owner's specified supplier.

Q. When you say you were trying to get submittal data from Hendee, what does that mean?

A. We requested a submittal, a list of materials and what they were going to use. And in a case like this when you're using an exact specified project, it's just a formality to get the literature in for the file. But Jim Bailey was pushing us to get the shade cloth and get it installed. He said go ahead and read it, it's right in the specifications. This letter is after. As I recall, this letter comes in after the fact after the shade cloth is already purchased and on site in the deep sea blue. Hendee finally sends the submittals in, and I think that Jeff Fuller saw his mistake and changed it to brown instead of the deep sea blue.

Q. Let's take a step back. The submittals were furnished to Mr. Fuller?

**A. Yes. They were supposed to have come to us, but they went directly to Mr. Fuller because they had a working relationship and have done several AAFES projects.**

Q. And this is Mr. Fuller's notice to you that the submittals were acceptable?

**A. Yes.**

Q. And in connection with notifying you that the submittals were acceptable, he advised you that the cover should be brown, not blue?

**A. Correct.**

Q. And you didn't have approved submittals before getting this letter?

**A. No. We had directives to order it based on the specifications.**

Q. Was that a written directive?

**A. It's in meeting minutes.**

Q. And do you know when that occurred?

**A. Right in the beginning of the project, January, February, March of '99 we were directed to get it there because we supposedly only had 30 days to do phase one.**

**A. It was given to Jim Bailey.**

Q. And I guess it says up at the top to Kendrick David Dowling Architects. Is that who it was submitted to?

**A. Yes.**

Q. And this was a request for information concerning downspouts?

**A. Correct.**

Q. Do you know did you get a response from Mr. Bailey concerning this RFI?

**A. I could not find one in the files. I didn't see one.**

**(Deposition Exhibit No. 18 was marked for identification.)**

**BY MR. HARRINGTON:**

Q. Marked as Exhibit 18 is a document that's very similar to Exhibit 17 but has some additional writing at the bottom. Is this the response that you received from Mr. Bailey?

**A. It would appear to be so, yes.**

Q. Does it appear to have been signed by James Bailey, contract administrator?

**A. Yes.**

Q. And what does it say about your request for information?

**A. It simply says the sketch is approved at the point of entry into the PVC pipe.**

Q. After getting this response to your request for information did you submit a request for a change order relating to the information you got back?

**A. I could not find one in the files. There was a correction up here on this middle line where it changed it from a 4-by-6 to a 4-by-5, but it's insignificant.**

Q. So as best you know, there was no request for a change order that C.D. Hayes submitted concerning this RFI?

**A. To the best of my knowledge, no.**

Q. Go back, if you would, to Exhibit 8. Your interrogatory answer indicates that RFI 107 relates to RFP 67; correct?

**A. Yes.**

Q. What does Exhibit 8 indicate happened

with respect to RFP 67?

**A. It indicates that there was a COR issued, so one or the other of these numbers is wrong. There's a big difference between $300 and $2,475.**

Q. Does this indicate that RFP number 67 was considered a change order and that that change was implemented through contract amendment 24?

**A. RFP 67, whatever it entailed, yes, was taken care of by a change order.**

Q. Let's go ahead and look, if you would, at Exhibit 5, which are our contract amendments. Flip, if you would, to contract amendment 24. Does contract amendment 24 show that you were given a $2,475 increase in connection with change order 67?

**A. Yes, it does.**

Q. And was change order 67 a change concerning tying in downspouts at the entrance canopy of phase three?

**A. Yes.**

Q. So you'd already received a contract price increase for changes to the downspouts on the project?

A. Yes.
Q. And after receiving that contract amendment -- let me start again. After contract amendment 24 was issued, you didn't submit any new or additional requests for a change order concerning downspouts; is that correct?
A. Correct.
(Deposition Exhibit No. 19 was marked for identification.)
BY MR. HARRINGTON:
Q. Did you have something to add to your last answer, Mr. Hayes?
A. Yes. Number three appears, after having looked at the documents, because what I had, I didn't see this piece and therefore I didn't know it had been approved, so when we answered that interrogatory, that was in error because we'd already paid for it.
Q. So just to be clear, what you're saying is in error is paragraph three of interrogatory one.
A. Correct.
Q. Paragraph 4 of interrogatory number one

refers to RFI 129, Mr. Hayes.

**A. Correct.**

Q. I've put in front of you a document that's been marked as Exhibit 19.

MR. YARBOROUGH: Is it change order 101?

MR. HARRINGTON: Yes.

BY MR. HARRINGTON:

Q. What is the document that's been marked as Exhibit 19, Mr. Hayes?

**A. A change order request for rebar and dumpster pad.**

Q. And so this is a request for a change order relating to RFI 129 that you submitted to AAFES?

**A. Yes. And I'll give you the same comment on that one. Number four is in error, too, because it had already been done, based on Exhibit 8.**

Q. So Exhibit 8 shows that you were in fact given a change order for RFI 129?

**A. Yes.**

Q. And that that was done through a contract amendment?

A. **Correct.**
Q. Which contract amendment?
A. **Let me look at this just a minute. Amendment number 31.**
Q. And so you were paid for the change in RFI 129?
A. **That's correct.**
Q. Paragraph 5 in your answer to interrogatory number one refers to RFI 133 and 134. Is that correct, Mr. Hayes?
A. **Yes.**
Q. And RFI 133 and 134 concern work in the last phase of the project?
A. **Correct.**
Q. Did you get a response to RFIs 133 and 134?
A. **Yes, and the response was they denied it, to which I appealed their denial and was terminated.**
**(Deposition Exhibit No. 20 was marked for identification.)**
**BY MR. HARRINGTON:**
Q. Marked as Exhibit 20, Mr. Hayes, is a

document that appears to be a fax memo from Jim Bailey to C.D. Hayes directed to your attention dated June 15th, 2000. Do you see the document?

**A. Yes.**

Q. Do you recognize it?

**A. I think I remember it, yes. Yes, I do.**

Q. Is this the response that you got to RFI 133 and 134?

**A. Yes.**

Q. And you would have received this on or about June 15th, 2000?

**A. Yes.**

Q. What was the response to RFI 133?

**A. It's a little hard to read. Their response was that there was no error or omission in the drawing, that we were supposed to basically know the architect's intention.**

Q. Mr. Hayes, the contract was terminated about a week after you got this response to your RFIs; correct?

**A. Yes, sir.**

Q. And you submitted the RFIs before you'd

done the work that was discussed in request for information 133 and 134; is that correct?

**A. I do not believe we had done the work.**

Q. So you were inquiring about how to do the work before you actually started doing it?

**A. Right, to see that it was supposed to be done because it wasn't on the drawings, and then they said yes, it was, and they indicated it was not a change situation, which I sent a reply to and disagreed with, and then about a week later I was terminated.**

Q. Did you say about a week later the contract was terminated?

**A. Approximately.**

Q. Later in June of 2000?

**A. Correct.**

Q. Looking at paragraph 6 of your answer to interrogatory one it talks about additional time.

**A. Correct.**

Q. And it makes a reference to 425 days. How much of that 425 days concerns the changes identified in paragraphs 1 through 6 of this

**A. 36, yes, the $109,083. And I put it in for $123,000 and Paul Kelleher called me and asked me not to take anything, just to pay enough to pay the subs back, and to get the money in the subs's hands, and actual money out of pocket, I agreed.**

Q. And so this contract amendment solved the problems with the temporary trailers you were talking about?

**A. As far as the financial issue, that's correct.**

Q. Now, up and until that contract amendment you believed you were owed additional money by AAFES in connection with the trailers?

**A. For the time and the impact on the job.**

Q. Was it also for the cost of the trailers that you thought you were owed money from AAFES?

**A. No, because that was being worked on.**

Q. Let's get back to the back charges you mentioned. I'm going to try to figure out how that was. You were incurring costs for the trailers; right?

**A. Correct.**

Q. And so when you submitted a progress payment request to AAFES you would get money paid out through that progress payment that was owed to you and owed to your subcontractors; correct? .

**A. Correct.**

Q. When you say back charging, does that mean you would take some of the money that was going from a progress payment to the subcontractors and charge some of that money for these other issues?

**A. Yes. They were notified in writing that there would be a deductive change order issued to their subcontract, and as soon as we got it resolved, I immediately, whenever Paul Kelleher overnighted me the check I immediately wrote checks out to the subcontractors and hand carried it to most of them.**

Q. Whether you say you got the check, that was the check from change order 36?

**A. Yes, sir.**

Q. On how many progress payments received from AAFES did you include back charges to your subcontractors?

**A. I don't recall.**

Q. Was it more than one?

**A. I would say it was probably more than one. We had a contractor problem with cleanup, and I did have to do cleanup for them. They wouldn't clean up themselves, and I had to do some cleanup and charge them for it.**

Q. So there were back charges in addition to the trailer back charges?

**A. Yes.**

Q. And there were also clean up back charges?

**A. Right. That was the other thing. There was clean up cost and then there was this trailer issue.**

Q. How many different subcontractors were affected by the back charges?

**A. I don't recall. I think in house we tried to determine who was on the project at that particular time and could it be reasonably construed as having a part in delaying it, and it was divided up amongst those. I don't remember how many.**

Q. And these back charges were monies that

would have gone from AAFES through you to the subcontractor if you hadn't had these back charges?

**A. Yes.**

Q. So they were some of the monies that were owed for work that the subcontractor had performed under the Fort Eustis contract?

**A. Right, subject to the adjustment of back charges.**

Q. Was there anything other than clean up costs in the trailers for which you back charged the subcontractors?

**A. I don't think so.**

Q. Over what period of time were the subcontractors subject to these back charges? Would it have started in 1998?

**A. I don't recall. I think it was in '99. The clean-up had gotten out of hand. Jim Bailey had told me to hold money on subs to motivate them in one of his letters, hold an additional 4 percent retainage on them, and I did that to try and motivate them, they screamed, and he said oh, we can't do that unless you want to give the money back to AAFES, so I**

**just went ahead and gave the money to the sub.**

Q. Retainage and back charges are two different things; is that correct?

**A. Yes. He was trying to use us to motivate the subs.**

Q. And there was a separate retainage for each of the subcontractors?

**A. Yes.**

Q. What percentage fee was that for the subcontractors?

**A. The whole project was 10 percent.**

MR. HARRINGTON: I have no further questions for Mr. Hayes.

MR. YARBOROUGH: I just have one or two.

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. YARBOROUGH:

Q. When you submit a payout to the federal government for work performed by your subs, they actually perform that work; is that correct -- they had actually performed that work; is that correct?

**A. They had performed the work and sent in a bill. Sometimes their bills were not accurate to us.**

UNITED STATES OF AMERICA )

ss:

DISTRICT OF COLUMBIA )

I, KEITH A. WILKERSON, a Notary Public in and for the District of Columbia, do hereby certify that the within transcript is a true and accurate record of the testimony under oath and other proceedings in the above-entitled matter.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties to this action and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of April, 2007.

KEITH A. WILKERSON

My Commission expires:

November 16, 2009

KENDRICK DAVID DOWLING ARCHITECTS, INC.
ESTABLISHED 1956
C. J. KENDRICK, III, AIA
DON W. DAVID JR. AIA
JAMES R. DOWLING, AIA
MARGARET S. ESPY PSMA
CORP. LIC. AAC000264

May 26, 1998

Mr. Robert R. Rooks, Jr.
Project Manager
C. D. Hayes, Inc.
1009 Executive Blvd., Suite 100
P.O. Box 2241
Chesapeake, VA 23327-2241

RE: Expand Shopping Center
Fort Eustis, VA
Project No.: 0310-96-007
Architect's Project No.: 9616
**GARDEN SHOP SHADE CLOTH SUBMITTAL**

10530

Bob;

I have been in contact with Mr. Jearald Dyer at Hendee Enterprises regarding the Enduro Shade Cloth for the Garden Shop framing system. He has furnished me with the required submittal data and samples. I have reviewed the information, and it is in compliance with the requirements of the Contract Documents. Copies are hereby enclosed for your records and distribution. Please be advised that the color of the shade cloth shall be Brown in lieu of the Deep Sea Blue in order to conform to the color requirements established by the Post.

Please coordinate the installation of the shade cloth with the aluminum canopy framing system to ensure that the proper fastening system is provided.

Sincerely,

Jeff Fuller, AIA
Architect

Enclosures

C: Bob Bernhard
Jim Kendrick
Jim Bailey

EXHIBIT
13
4/19/07
PENGAD 800-631-6989

*-----------------------------------------------
* Printed For: BERNHARD
*-----------------------------------------------

Date: Monday, 15 March 1999 11.48 CT
To: *, KELLEHER, WULFF
From: BERNHARD
Subject: Eustis shade cloth

Just got a call from Jim Kendrick who talked with the shade cloth manufacturer. The had an initial request for green cloth in Dec 97
In Jan 98 it was changed to blue which has been fabricated.
In May 98 they got approved shop dwg , but Kendrick etc had not seen or app'd.
At no time has any cloth been shipped to Colorado or anywhere.
The existing run of blue cannot be changed and the mfgr is waiting for CDH to pay then for the original order before starting on a new order,
Jim kendrick is expecting a package showing these dates with samples.
It looks as it will be two week to run the material after payment and approval of clolor, therefore my guess shade cloth not before 4 weeks.

It seems we have been fed 'smoke'.

cc: Jim Bailey