UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -x

C.D. HAYES, INC., : Certified Copy

Plaintiff, :

v. : No. 01-376C

THE UNITED STATES, :

Defendant :

- - - - - - - - - - - - - - - -x

Washington, D.C.

Thursday, April 5, 2007

The deposition of DOUGLAS MORRIS, called for examination by counsel for Defendant, in the above-entitled matter, pursuant to notice, at the offices of U.S. Department of Justice, 1100 L Street, Northwest, Washington, D.C., convened at 11:35 a.m., before Judy Brown, a notary public in and for the District of Columbia, when were present on behalf of the parties:

P R O C E E D I N G S

DOUG MORRIS

called for examination by counsel for the Defendant, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. HARRINGTON:

Q Good morning, Mr. Morris.

**A Good morning.**

Q Could you state your full name for the record.

**A Robert Douglas Morris.**

Q I took your deposition as part of the 30(b)(6) deposition of C.D. Hayes. Do you remember the instructions I gave as part of that deposition?

**A Yes.**

Q Please basically do the same thing for this one. You're under oath and I'll be asking you questions. If you don't hear something, let me know. If you something's unclear, let me know.

I don't expect it to go that long, but we may take a break for lunch.

A Okay.

Q Mr. Morris, I believe you've already given some testimony about the work you did for C.D. Hayes; is that correct?

A Yes.

Q When did you join the company?

A I had been with the company for about two years before Fort Eustis started and then I left in -- right about June of 2000.

Q Your position with the company was as a vice president?

A Vice president, yes.

Q You became the project manager for the Fort Eustis project at one point?

A Yes.

Q Do you recall about when that was?

A If I'm not mistaken, it was in the early part of 1998, probably about May or June of 1998.

Q Now, the project contract has a date of

A It's 112 Hunters Trail West, Elizabeth City, North Carolina 27909.
Q When you were working on the Fort Eustis project, did you have interactions with C.D. Hayes' subcontractors?
A Yes, I did.
Q What was the nature of your interactions with subcontractors?
A Directing them to do certain portions of the work, making sure it was done according to plans and specs.
Q Did you have a role in ensuring that the subcontractors were paid?
A Yes.
Q What was your role in that respect?
A I would draw or get all of the change orders or the monthly pay requests, compile them, go to Jim Bailey. We would sit down and review the pay applications, then I would sign the pay application if he agreed with it, and then it would go to Paul Kelleher.
Q Did you certify the pay applications on

behalf of C.D. Hayes?

A Yes, I did.

Q These pay applications concerned payments directly to C.D. Hayes and also for C.D. Hayes' subcontractors?

A Yes.

Q Mr. Hayes testified yesterday about certain back charges. Are you familiar with the phrase "back charge"?

A Yes.

Q What is your understanding of that phrase?

A In most contracts that you have with subcontractors, there are provisions in the subcontract that allow you to do deductive or additive change orders in pursuing any of their work or them pursuing any of your work, and that can be a deductive change order or an additive change order, whether it's called a back charge.

But normally it's if you -- and again it's in your contract with your subcontractor. If you do any of their work, they have agreed that

A Yes.

Q Were there any other instances in which a back charge could occur?

A Yes. Like in for instance when we were forced to provide the monthly rental on trailers on the AAFES project, it was determined by Jim Bailey that the reason that we had to provide the trailers, which if I'm not mistaken there were five of them, for the vendors in the AAFES building to continue their work.

It was done because of -- we were not done in a timely manner. The timely manner that something is not done in is not one person's responsibility. It's a group of people that have to do something to get to the -- to the end.

In this process if you have 10 people that are all working together to get to a deadline and you don't make it, who's responsible for not getting there, it's 10 people, it's not one.

Q Were there back charges to subcontractors for the rental of trailers for the Fort Eustis contract?

A Yes. Percentage-wise, yes.
Q Were there back charges to subcontractors for anything else on the Fort Eustis contract?
A Cleanup, dumpster fees, yes.
Q Were there back charges for anything beyond the trailers and the cleanup and dumpster fees to subcontractors?
A I don't recall any other. That's normally -- as far as cleanup and dumpster fees, that's very common in the industry, not just on government job, but private sector as well.
Q Let's deal with these back charges separately. When did C.D. Hayes begin back charging subcontractors for the trailer rentals?
A If I'm not mistaken, it was either the second month we were charged or the third. We took the burden of it the first month, because that's supposedly all it was supposed to be.
It was supposed to be for only one or two trailers. When the other trailers started coming in -- of course each trailer requires a

generator and generators don't run by themselves. You have to put laborers out there to put in gas and oil and the maintenance and stuff like that, so that's a fee that you're incurring or a cost you're incurring. Next thing I knew there was -- if I'm not mistaken there were five trailers.

Q You said you began back charging subcontractors, was it two or three months into the project?

A No, no, not into the project. It's when the trailers started arriving.

Q When did the trailers start arriving?

A The exact time, I'm not sure. It was in the fall, late fall, so it had to be late fall of '99.

Q It wasn't the late fall of '98?

A No, uh-uh. Because I really didn't get on site until '99, and I was there through part of that -- wait a minute, it might have been '98, because Bob Rooks was there in a portion of that and I was too. So I think we kind of overlapped

**in that area, but I'm not positive.**

Q To the best of your recollection right now, would it have occurred when Bob Rooks was still there -- let me start the question over again.

Would you have begun using and paying for trailers while Bob Rooks was still there or did it begin after he left?

**A No. It would have to be while Bob Rooks was still there, because some of the vendors were displaced in a building that had to be demoed. So like the barber shop, that was one. So that was when Bob Rooks was there, yes.**

Q So based on your recollection that it was when Bob Rooks was there, does that allow you to give a more accurate time for about when you started using these trailers?

**A No. I couldn't give you an absolute time. All I remember was that it was cold, because we had to provide heat. So it could have been the latter part of '98 or even the early part of '99.**

Q Once you had the trailers on site after about two months or maybe three months, you began back charging your subcontractors?

**A To the best of my knowledge, yes.**

Q Were you personally involved in the pay applications at that time?

**A No. At that time, I was not.**

Q When did you become involved in the pay application?

**A After Bob Rooks left the project. If I'm not mistaken, that was May or June of '99.**

Q Now, you mentioned back charges for cleanup and dumpster fees and that sort of thing, when did that begin?

**A Best of my recollection, it was in the Phase 5 when we were trying to clean up so the owner could move in to Phase 5. There was a massive amount of drywall. Drywall is horrendous.**

**Electrical because of the fixture cartons and all that kind of stuff, there's a lot of debris that generated in finishing up a certain project or a certain portion. If I'm not**

C.D. Hayes, Incorporated, would put in for a request for progress payment for AAFES, and AAFES would approve whatever amount they approved as the progress payment, which would include monies going to C.D. Hayes and to subcontractors; correct?

**A Um-hum.**

Q When C.D. Hayes -- ordinarily C.D. Hayes would receive a check from AAFES for that amount?

**A Yes.**

Q Then C.D. Hayes would be responsible for paying the amounts due to the subcontractors from that progress payment?

**A Yes.**

Q When there were back charges, C.D. Hayes would pay less than the amount received from AAFES as part of that progress payment and keep part of the money that it received in that progress payment that would otherwise go to the subcontractor?

**A Well, let me say this: Not being in**

the office and not being in the accounting department, I don't know exactly how that was all handled.

I can -- from working on other contracts not this one specifically, I can pay a subcontractor and they can reimburse me. Or through the contractual agreement I have with them, they agree front end to reimburse if I have to do anything contractually for them.

I do not know, because I wasn't there in the office and didn't sign any checks, I don't know exactly how that was handled.

Q Did you get complaints from subcontractors about the back charges?

A You always get complaints about back charges from subcontractors.

Q Did any of the subcontractors tell you that they weren't paid as much money as they believed they were due?

A I have had subcontractors tell me that they had applied for certain monies and that there was -- that they did not get what they were --

**felt they were entitled to.**

Q Were they telling you that was because of back charges?

**A Primarily.**

Q So based on what the contractors were telling you then, monies that C.D. Hayes received as part of its progress payments were not all passed through to the subcontractors?

**A From what they were saying.**

Q Did you have any reason to believe that that -- what the subcontractors were telling you about the back charges was not in fact true?

**A I'm the one that would get with the subcontractors at our weekly meetings and would sit down and tell them we need to get items cleaned up. And if you don't get them cleaned up, then I will assess a percentage of the cleanup cost to you. I told them up front and before it ever happened.**

**So they knew when they had a cost. If the people jumped in and they hired the manpower and they did their work, they were not back**

A Yes.
Q And that was work you were doing in your capacity as vice president and project manager?
A Um-hum.
Q If you could say yes to the questions.
A Yes.
Q Um-hum doesn't show up very well on the transcript.
A Okay.
(Morris Exhibit Number 1 was marked for identification.)
BY MR. HARRINGTON:
Q Mr. Morris, do you recognize this form, the document?
A Yes, I do.
Q What is it?
A It's a standard AIA form for payment.
Q When you say "AIA" what does that refer to?
A That's an architectural term. Architects draw this up and it's a standard form.

**It's used throughout the industry.**

Q Is there something that would have been submitted to AAFES as part of your request for progress payments?

**A Yes.**

Q Was this form in fact submitted as part of the Fort Eustis project?

**A Yes.**

Q It was submitted on behalf of C.D. Hayes, Incorporated?

**A Yes.**

Q Looking down at the contractor line, do you recognize the signature there at the contractor line?

**A Yes, that's mine.**

Q It's dated August 4, 1999?

**A Yes.**

Q Was this at a time when you were the project manager?

**A Yes, sir.**

Q Are you familiar with the certification block above your signature?

A I have been made aware of that, yes.

Q When you say you've been made aware of that, what do you mean?

A I've had some instances to be reminded what that little verbiage says.

Q What are those instances?

A With the CID investigator, threatened to throw me in prison because of that.

Q What was the name of the CID investigator?

A He had an Italian last name, I really --

Q Was it John Ancellotti?

A Yes.

Q Does the certification block read: Undersigned contractor certifies that to the best of the contractor's knowledge -- there's a word obscured -- and belief, the work covered by this application for payment has been performed in accordance with the contract documents, that all amounts have been -- there's a word obscured, I may have to get the originals to these

documents -- contractor for work for which previous certifications for payment were issued and payments received from the owner, and the current payments shown herein are now due?

**A Yes.**

Q At the time you executed this, you executed under that certification block?

**A Yes. And to the best of my knowledge reading that and signing that, that was what I believed.**

**(Morris Exhibit Numbers 2 and 3 were marked for identification.)**

**BY MR. HARRINGTON:**

Q You see the documents that been marked as Exhibit 2, Mr. Morris?

**A Yes, I do.**

Q What is this document?

**A It is another pay application for September 9th, 1999.**

Q Is this an application for the Fort Eustis project?

**A Yes.**

Q Was it submitted to AAFES on behalf of C.D. Hayes?
**A Yes, it was.**
Q Did you also sign this pay application?
**A Yes, I did.**
Q Is that your signature under the line contractor C.D. Hayes on the left-hand side of the form?
**A Yes, sir, it is.**
Q Was this signature you made notarized?
**A Yes, it was.**
Q Was it routine to notarize the signatures made on the payment applications?
**A Well, I've done them both ways.**
Q The first one we looked at, Exhibit 1, was your signature also notarized on that one?
**A I think it was, but the seal's not there, but notary's name and everything is. Normally it is.**
Q Exhibit 2 was notarized?
**A Yes, because the seal is on it.**
Q Exhibit 3, does that appear to have

been notarized?

A Appears to have been notarized, but there's no seal.

Q Looking at Exhibit 3, is that a third application for a progress payment on the Fort Eustis project?

A Yes, for the month of November 1999.

Q This was also done on behalf of C.D. Hayes?

A Yes.

Q That is your signature under the contractor block?

A Yes, sir, it is.

Q I believe you said that you believed this to have been notarized?

A Yes.

Q So at least as far as these three applications are concerned you believe that each of them was notarized?

A Yes.

Q We can see a little bit more of the certification block here. Is part of the

certification on each of these forms that, quote, all amounts have been paid by the contractor for work for which previous certificates for payment are issued and payments received from the owner, unquote?

**A Yes.**

Q The amounts that have been paid for work would include amounts that were owed for '02 subcontractors; correct?

**A Yes, sir.**

Q So as part of this certification, you're certifying that the amounts paid by AAFES have been properly passed through to your subcontractors; correct?

**A To the best of my knowledge, yes, sir.**

Q So that was your understanding of part of what you were certifying; correct?

**A Yes, sir.**

Q Did the documents submitted to AAFES as part of your applications for progress payment requests inform AAFES that you were going to be making back charges to the subcontractors?

**A Not necessarily, no.**

Q Did any of these three indicate to AAFES that you would be back charging subcontractors?

**A No. That's nothing -- has nothing to do with AAFES, that's a contractual obligation between the subcontractor and the general contractor.**

Q So you didn't inform AAFES as part of these certificates for progress payments that there would be back charges levied against subcontractors?

**A No.**

Q Would that be equally true for these three and for other certificates for progress payments that were submitted for the Fort Eustis project?

**A Right.**

Q Do you know how many instances there were when C.D. Hayes back charged one of its subcontractors?

**A No.**

Q Do you have a rough estimate?
**A No, I do not.**
Q Do you know if it would have been more this than 10?
**A No, I have not a clue.**
Q Now, the three documents that we've marked as Exhibits 1, 2, and 3, why were those submitted to the government?
**A For progress payments for work completed.**
Q They were submitted in order to obtain money payments from the government?
**A Yes.**
Q You understood that this was the form that was required to request a progress payment?
**A Yes.**
Q The form required for requesting a progress payment included the certification we discussed?
**A Yes, sir.**
**(Morris Exhibit Number 4 was marked for identification.)**

BY MR. HARRINGTON:

Q I've marked as Exhibit 4 Mr. Morris employer a declaration that was prepared by Mr. John J. Ancellotti. I want to ask you about some of the statements in this declaration.

If you would focus on paragraph 5, it says: During the summer of 2000 and as part of my investigation, I interviewed C.D. Hayes former vice president, Mr. Robert Douglas Morris, on two occasions. Is that accurate?

A Yes, sir, it is.

Q It says: The first interview of Mr. Morris took place on July 25, 2000, at the cafeteria of U.S. Army Corps of Engineers, Norfolk District, at 9:20 a.m.

A Yes.

Q Is that accurate?

A Yes, sir, it is.

Q Is the remainder of paragraph 6 of the declaration accurate?

A Yes, it is.

Q If you would look at paragraph 7 of

this declaration. Is that also accurate?

A Yes.

Q Looking at paragraph 8, did Mr. Ancellotti contact you about July 31, 2000, to go over his interview notes?

A Yes.

Q Did you meet as described in paragraph 8?

A Yes.

Q That meeting took place on August 4, 2000, at the NCIS Fraud Office?

A Yes. According to this, yes. I don't recall the time, but I do recall the incident.

Q The time and date are not inconsistent with your recollection?

A No.

Q You just don't remember one way or the other?

A Right. Yes.

Q Looking at paragraph 9, does that appear to be accurate as well?

A Not as accurate as I remember.

Q Is there anything specific in paragraph 9 that you disagree with or that you would like to add to or change?

**A I'd like to add a lot to this.**

Q Let's start with --

**A Let's go to the very first phone conversation -- or the very first time that I met this gentleman.**

Q I'll go back to that, but let's focus on paragraph 9 so we can work our way through and then I'll come back to that.

Is there anything in paragraph 9 that you feel is not accurate?

**A They didn't say anything about custody that I can recall and that I could leave any time I wanted to.**

Q Did they tell -- let me ask you that differently: Did they tell you that you were in custody or that you could not leave?

**A No, no, they did not.**

Q Looking at paragraph 10, it says that Mr. Ancellotti asked you to read the eight pages

of typed notes that he assembled from your earlier interview. Did you do that?

**A Yes, I did.**

Q Did he ask you to make changes in your handwriting as you wanted?

**A Yes, he did.**

Q Did you make any changes?

**A Yes, I did, because of what was written was not what I had said at our first meeting in the cafeteria.**

Q So you made corrections where you felt it was appropriate?

**A Yes.**

Q Were they one-page statement then typed up?

**A Yes.**

Q Did you review and then sign that one-page statement?

**A Yes, I did.**

Q Were you threatened with arrest if you didn't sign that statement?

**A No. I was threatened that I could go**

**to -- I could be put in a federal prison for signing those documents.**

Q The ones that we've already looked at?

**A Yes.**

Q Were you ever told to sign or admit to something that was false?

**A I was never told that, no.**

Q I'll put the statement itself in front of you in a little bit and we can talk about it further.

**A Yes.**

Q Did Mr. Ancellotti tell you that you were subject to immediate arrest?

**A Not immediate arrest, no.**

Q Did the agent who was there -- let's look at paragraph 11. Did Special Agent O'Donnell tell you that you were subject to immediate arrest?

**A I don't remember him saying anything other than identifying who he was and that was it.**

Q He didn't have any other role that you --

**A Not to my -- I do not remember him speaking other than him being introduced to me as an FBI agent and his name and that he was there to witness whatever we were discussing, and that was it.**

Q You said you signed a one-page statement while you were there?

**A Yes, I did.**

Q After you signed that statement, the interview ended and you left the office?

**A Yes.**

Q It says the entire interview took less than 90 minutes?

**A That's about correct. Seemed like a week, but it wasn't that long.**

Q Mr. Morris, I think I asked you this about some paragraphs, but I think I stopped at one point, so let's go back a little bit.

Paragraph 10 -- does paragraph 10 appear to be inaccurate?

**A Not the way this is written, it's not, no.**

# CERTIFICATE OF NOTARY PUBLIC

I, JUDY BROWN, the officer before whom the foregoing deposition was taken, do hereby testify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me by stenographically and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto nor financially or otherwise interested in the outcome of the action.

JUDY BROWN

Notary Public in and for
the District of Columbia

My Commission expires: November 30, 2007

**CERTIFICATE OF FILING**

I hereby certify that on the 29th day of January 2008, a copy of "APPENDIX TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Harrington