**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| C.D. HAYES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01-376C |
| | ) | (Judge Margaret M. Sweeney) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(d)(1) of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following proposed findings of uncontroverted fact in support of its motion for summary judgment.

**The Fort Eustis Contract**

1. On December 3, 1997, the Army and Air Force Exchange Service ("AAFES") awarded C.D. Hayes, Inc. ("C.D. Hayes") a contract to renovate and expand a shopping center at Fort Eustis, Virginia. DA1.

2. Construction was to proceed in six phases and be completed by May 27, 1999. DA100-02.

3. The original contract amount was $5,769,405. DA1.

4. The contract authorized the contracting officer to make changes to work within the general scope of the contract "by written order designated or indicated to be a change order." DA8 (paragraph 36(a)).

5. "[P]rovided that the contractor gives the contracting officer written notice stating the date, circumstance, source of the order, and that the contractor regards the order as a change order," any other written or oral order from the contracting officer, which caused a change in the

material, the specifications, or the method or manner of work, was to be treated as a change order. DA8 (paragraph 36(b)).

6. No claim under the Changes clause of the contract could be approved for costs "incurred more than 20 days before the contractor gives [the requisite] written notice" to the contracting officer. DA8 (paragraph 36(d)).

7. No claim under the Changes clause asserted after final payment to the contractor could be approved. DA9 (paragraph 36(f)).

8. The contract authorized the contractor to request monthly progress payments. DA11.

9. The contract contained a clause providing that, in order to secure progress payments, the contractor had to submit a written application, signed by its authorized representative, certifying that "payments to subcontractors and suppliers have been made from any previous payments received under the contract," that "timely payments will be made from the proceeds of the payment covered by this certification," and that "this request for payment does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor." DA11-12.

10. Additionally, under the contract, before ordering materials, C.D. Hayes was to submit the name of the manufacturer, the model number and other identifying data, and information respecting performance to the contracting officer for approval. DA7. "Machinery, equipment, material and articles [that were] installed without the required approval [were] installed at the risk of subsequent rejection" by AAFES. DA7.

11. According to Mr. Hayes, this submittal process was to proceed as follows: C.D. Hayes would approach the supplier of needed material to request a product description and price. When information arrived, it was provided to the project architect. The architect would then review the proposed material and would sign off on the proposed purchase. After receiving approval, C.D. Hayes would purchase material for the project. DA116-18.

**Contract Amendments**

12. Prior to June 26, 2000, when the contract was terminated for default, the parties had executed 35 contract amendments.[1] DA15-47, 49-50.

13. Each contract amendment contained a standard release providing that "[t]he foregoing decrease/increase in contract price is in full settlement of all entitlements directly or indirectly arising out of these changes." DA15-47, 49-50.

14. In contract amendments 14 to 21, C.D. Hayes reserved the right to request additional time to complete the project based upon the contractual changes. DA28-35 (stating "[w]e reserve the right to place a claim for an adjustment of the contract completion date as a result of the impact of this amendment").

**False Progress Payment Certifications**

15. On August 4, 1999, September 9, 1999, and November 9, 1999, C.D. Hayes applied for progress payments. DA51-53 (seeking payments in the amount of $119,706.00, $135,196.00 and $97,413.00, respectively).

[1] Contract amendment 34, which concerned various alleged delays in contract performance, was prepared but not executed by the parties. DA48.

16. C.D. Hayes used forms entitled "Application and Certification for Payment" to request these progress payments from AAFES. DA51-53.

17. The August 4, 1999, September 9, 1999, and November 9, 1999 progress payment requests were executed upon behalf of C.D. Hayes by company vice president Robert D. Morris. DA51-53.

18. C.D. Hayes's authorized representative at this time was company vice president and project manager, Robert D. Morris. See DA94, 152-54.

19. C.D. Hayes certified that "all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued." DA51-53.

20. C.D. Hayes began the practice of levying "back charges" on its subcontractors in late 1998 or early 1999. DA156-58.

21. C.D. Hayes withheld "back charges" from progress payments from AAFES that were intended for C.D. Hayes's subcontractors. DA145-46, 155-62.

22. Consequently, rather than paying subcontractors the full amount requested and received from AAFES, C.D. Hayes had withheld monies intended for its subcontractors. DA145-46 (acknowledging that C.D. Hayes "would take some of the money that was going from a progress payment to the subcontractors"); DA155-62 (admitting that C.D. Hayes was "back charging" its subcontractors).

23. C.D. Hayes's subcontractors objected to this practice. DA54-61 (Bay Lighting) (complaining about "bogus backcharges"); DA68 (Lawson Mechanical) (objecting that Lawson had "been backcharged over $30,000 by C.D. Hayes"); DA64 (Sprinkle Masonry) (objecting

that "once again" C.D. Hayes had "illegally removed funds from one of our progress payment applications (#15 for August 1999)").

**Contract Termination**

24. On June 26, 2000, AAFES terminated C.D. Hayes's contract for default because C.D. Hayes had failed to man the job site and was making no progress toward completion of the project. DA75.

25. The project was completed by C.D. Hayes's surety. DA103-04.

**Morris Statement**

26. After C.D. Hayes's contract was terminated for default, Mr. Morris executed a signed, witnessed statement in which he confirmed that certifications made in several of C.D. Hayes's progress payment requests were false. DA94.

27. This written statement was based upon information that Mr. Morris provided to a Government investigator in mid-2000. DA89-93, 172.

28. Mr. Morris was given an opportunity to review and change his statement before signing it. DA89-93, 174-75.

29. Mr. Morris requested that certain changes to the statement be made. DA89-93, 175.

30. Once the requested changes were made, Mr. Morris signed the statement in front of two witnesses. DA89-93, 172-77.

31. Mr. Morris' statement reads in pertinent part:

> 4. During the course of my employment at [C.D. Hayes] as a vice president/project manager, I signed several documents on behalf of [C.D. Hayes], including forms called "Application and Certification for Payment." . . . [T]he Application and Certification

> for Payment forms I signed included those dated 08/04/99; 09/09/99; and 11/09/99.
>
> 5. At the time I made the certifications on these forms I knew that [C.D. Hayes] had not really paid all of the subcontractors the amounts they were due; due to back charges, disputes, or not being paid in a timely manner. Accordingly, the certifications I made on these forms were false and I knew that at the time.
>
> 6. I had, in fact, called the falsity of the certifications we were making to the attention of my superior at [C.D. Hayes], C. David Hayes, president of [C.D. Hayes], on more than one occasion. I was essentially told by him not to worry about such matters because that was how [C.D. Hayes] routinely conducted its business. [Mr.] Hayes further explained that he would usually authorize payment to a subcontractor when he needed some immediate future work from the subcontractor. Subcontractors whose services were no longer needed in the immediate future would have to wait, perhaps indefinitely, for payment.

DA94.

**Post-Termination Claims**

32. On September 29, 2000, C.D. Hayes submitted a claim letter to AAFES. DA75.

33. C.D. Hayes's claim letter contained two claims with respect to the contract: (1) a claim for conversion of the default termination to a termination for convenience; and (2) a claim relating to allegedly unissued change orders. C.D. Hayes v. United States, 74 Fed. Cl. 699, 707 (2006).

34. Attached to C.D. Hayes's letter were three requests for change orders that had previously been submitted to AAFES. DA80-86 (attaching requests for changes in connection with request for proposal ("RFP") 110, 111 and 113).

35. The change order requests attached to C.D. Hayes's claim letter sought an equitable adjustment for the installation of temporary circuits for area lighting, DA81-82 (April

21, 2000 submission for $2,610), the installation of additional concrete footings, DA83-84 (March 16, 2000 submission for $20,659), and costs relating to the "first order of shade cloth," DA85-86 (March 30, 2000 submission for $6,029).

36. C.D. Hayes's claim letter stated that C.D. Hayes had identified $49,506 in unissued change orders, DA76, but the change order requests attached to the letter reflected only $29,506 in allegedly unissued change orders, DA81-86.

**Alleged Hendee Canopy Change**

37. On May 26, 1998, upon reviewing a C.D. Hayes's submittal for shade cloth for canopies, the project architect informed C.D. Hayes that brown material should be used for the canopies. DA149A (Hayes Ex. 13).

38. Canopy shade cloth is a custom manufactured product. See DA149A-49B.

39. C.D. Hayes opted to order canopy shade cloth before making the requisite submittal to AAFES. DA134-35, 149A.

40. C.D. Hayes did not request that the contracting officer treat the project architect's May 26, 1998 letter as a change until March 30, 2000. DA85-86.

**Alleged Changes Not Referenced In C.D. Hayes's Claim Letter**

41. C.D. Hayes seeks an equitable adjustment of $4,647 concerning "GWB sheet rock" changes during the second phase of the project. DA106.

42. C.D. Hayes's September 29, 2000 claim letter makes no reference to sheetrock changes. DA76-80.

43. The requests for change orders appended to C.D. Hayes's claim letter do not concern sheetrock changes. See DA81-86.

44. Contract amendment 37 increased the contract amount by $4,647 for "GWB corrections." DA103-04, 110C.

45. AAFES paid $4,647 for GWB sheetrock changes in October 2000. DA103-04.

46. C.D. Hayes seeks an equitable adjustment of $10,000 for alleged costs in converting to a different scheduling software package. DA106.

47. C.D. Hayes September 29, 2000 claim letter makes no reference to costs of converting to a different scheduling software package. DA76-80.

48. The requests for change orders appended to C.D. Hayes's claim letter do not concern conversion to a different scheduling software package. See DA81-86.

49. No request for a change order about conversion to a different scheduling software package was ever submitted to AAFES. See DA131.

50. C.D. Hayes possesses no time sheets or other written records showing what cost, if any, was incurred to convert to a different scheduling software package. DA131.

51. C.D. Hayes seeks an equitable adjustment of "approximately $300" relating to changes to downspouts in accordance with RFP 67. DA107.

52. C.D. Hayes September 29, 2000 claim letter makes no reference to costs of changes to downspouts. DA76-80.

53. The requests for change orders appended to C.D. Hayes's claim letter do not concern changes to downspouts. See DA81-86.

54. Contract amendment 24 provided an additional $2,475 to "tie-in downspouts at Entrance Canopy Phase III." DA38.

55. Contract amendment 24 contains a release of all claims directly or indirectly related to changes addressed by the contract amendment. DA38.

56. C.D. Hayes was paid by AAFES for downspout changes. DA38, 136-40.

57. C.D. Hayes seeks an equitable adjustment of $7,819 for demolition work in the last phase (Phase VI) of the project. DA107.

58. C.D. Hayes never submitted a request for a change order concerning demolition work in Phase VI. DA76-86.

59. The contract was terminated before C.D. Hayes performed any work on Phase VI of the project. DA142-43.

**Termination For Default Affirmed**

60. On August 4, 2004, this Court held that C.D. Hayes had abandoned the contract during May and June 2000. Order of Judge Baskir (Aug. 4, 2004). On this basis, the Court affirmed the Government's termination of C.D. Hayes's contract for default. Id.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.

HAROLD D. LESTER, JR.
Assistant Director

s/ David A. Harrington

OF COUNSEL:

John Solan
Office of General Counsel
Army & Air Force Exchange Service
P.O. Box 650059 (GC-C)
Dallas, TX 75235-0059

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-0465
Facsimile: (202) 305-7644

January 29, 2008

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on the 29th day of January 2008, a copy of "DEFENDANT'S PROPOSED FINDINGS OF UNDISPUTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Harrington